NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MARIA JHAI (Cal. Bar No. 283059)
SOLOMON KIM (Cal. Bar No. 311466)
Assistant United States Attorneys
General Crimes Section
    1100/200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4138/2450
    Facsimile: (213) 894-0141
    E-mail:    maria.jhai@usdoj.gov
              solomon.kim@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-00157-CJC |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: July 6, 2020<br>Hearing Time: 9:00 a.m. |
| JACQUELINE ANDERSON, | Location:    Courtroom of the<br>Hon. Cormac J. |
| Defendant. | Carney |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Maria Jhai and Solomon Kim, hereby files its Sentencing Position.

//
//
//
//
//
//

1    This Sentencing Position is based upon the attached memorandum

2    of points and authorities, the files and records in this case, and

3    such further evidence and argument as the Court may permit.

4

5    Dated: June 8, 2020          Respectfully submitted,

6                                  NICOLA T. HANNA
                                   United States Attorney
7
                                   BRANDON D. FOX
8                                  Assistant United States Attorney
                                   Chief, Criminal Division
9

10                                      /s/
                                   _____
11                                 MARIA JHAI
                                   SOLOMON KIM
12                                 Assistant United States Attorneys

13                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   2

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

On February 5, 2020, a jury found defendant Jacqueline Anderson ("defendant") guilty of threatening to assault and murder a person assisting federal officers and employees, in violation of 18 U.S.C. § 115(a)(1)(B).  Defendant stood at the entrance of the Long Beach Social Security Administration ("SSA") Office and yelled at Protective Security Officer ("PSO") Bacchus, "I'm going to go to my car to get my gun to kill you and blow your [expletive] brains out." Defendant then immediately began walking toward her black Ford Mustang.  Defendant threatened to kill Officer Bacchus after he had asked defendant to wait in line to get into the building, and defendant had grown increasingly angry as she waited.  While in line, defendant shouted other obscenities and racial slurs, telling him that she was going to get his "black ass fired," and referring to the other visitors standing in line as "illegal Mexicans."  (See PSR ¶¶ 10-11.)

18
19
20
21
22
23
24

The United States Probation and Pretrial Services Office ("USPO") has filed a Presentence Investigation Report ("PSR") in this matter, calculating the total offense level as 14, and determining that defendant is in criminal history category I.  (PSR ¶¶ 35, 45.) The Guidelines range is therefore 15 to 21 months.  However, the USPO recommends one year of probation (a six-level downward variance), a $7,500 fine, and a $100 special assessment.  (Dkt. 69 at 1-2.)

25
26
27
28

The government concurs with the USPO's calculations, but recommends a one-level downward variance and the following sentence, in light of the factors set forth in 18 U.S.C. § 3553(a): (1) six months' imprisonment, followed by a term of supervised release with a

condition requiring six months' home detention, except defendant may leave her residence during her term of supervised release to maintain employment and participate in mental health treatment; (2) a $15,000 fine; and (3) a $100 special assessment.

## II.  STATEMENT OF FACTS

On the morning of December 12, 2018, defendant threatened a PSO at the Long Beach SSA Office, stating "I'm going to go to my car to get my gun to kill you and blow your [expletive] brains out."  The statement was the culmination of a series of escalating encounters between defendant and the three PSOs who were on duty that day.

When defendant arrived at the SSA Office that morning, she attempted to walk into the building without waiting in line.  (PSR ¶ 9.)  Officer Bacchus, who was at the front door where he was on duty, asked defendant if she had an appointment.  (Id.)  Defendant claimed that she did, but could not provide Officer Bacchus with any proof or confirm the date or time of her appointment.  (Id.)  Officer Bacchus then informed defendant that she would need to wait in line in order to be seen, at which point defendant became upset, cursed, and told Officer Bacchus that she did not want to wait in line.  (Id.)  Eventually, however, defendant went to the back of the line.  (Id.)

Several minutes later, when defendant had made her way near to the front of the line, defendant allowed a man to bypass the line and stand next to her.  (Id. at ¶ 10.)  Officer Bacchus, who noticed the man, went outside to inform him that he would need to wait, starting in the back of the line, just like everyone else.  (Id.)  Defendant then began shouting and cursing.  She referred to the other visitors standing in line as "illegal Mexicans," told Officer Bacchus, "f[ ]

1  you," several times, and called Officer Bacchus a racial slur.  (Id.)
2  Officer Kraft came outside in an attempt to speak with defendant as
3  well, but defendant continued to shout various profanities.  (Id. at
4  ¶ 11.)  Officer Bacchus told defendant that she would not be
5  permitted to enter the SSA Office that day, and the PSOs returned to
6  their duty stations inside.  (Id.)

7      Defendant stayed in line despite having been asked to leave.
8  (Id. at ¶ 12.)  When she made it to the front of the line, and
9  Officer Bacchus again informed defendant that she could not enter the
10 building that day, defendant again grew irate, cursed, and blocked
11 the entrance to the building.  (Id.)  In response to being denied
12 entry, defendant told Officer Bacchus that she didn't "give a f[ ]"
13 and that she would get his "black ass fired."  (Id.)  Officer
14 Whiteside also attempted to calm defendant down, but was
15 unsuccessful.  (Id.)

16     Finally, after several minutes of blocking the entrance,
17 defendant began to walk away toward her car.  (Id. at ¶ 13.)  As she
18 did, she looked at Officer Bacchus and yelled: "I'm going to go to my
19 car to get my gun to kill you and blow your f[]ing brains out."
20 (Id.)  When Officer Bacchus asked her what she had just said,
21 defendant responded, "You heard me," and continued to walk toward her
22 car.  (Id.)  All three PSOs on duty, Bacchus, Kraft, and Whiteside,
23 then quickly left their duty stations and came outside to the parking
24 lot to monitor defendant.  (Id.)  The PSOs observed defendant get
25 into her black Ford Mustang and drive off.  (Id.)  As a result of
26 defendant's alarming behavior and threat, Supervisor Huynh of the SSA
27 Office sent a letter to defendant informing her that she would no

28

1  longer be allowed to enter any SSA office for any reason without
2  prior approval (the "December 14, 2018 SSA Letter"). (Id. at n.1.)
3      Several days after the incident, Department of Homeland
4  Security, Federal Protective Service ("FPS") Senior Special Agent
5  ("SA") George Chapman went to defendant's home to speak with
6  defendant. (Id. at ¶ 18.)  When he did, defendant denied ever having
7  been at the Long Beach SSA Office on December 12, 2018. (Id.)  She
8  did, however, admit to owning the same black Ford Mustang, with
9  matching license plates, as the one the PSOs observed defendant drive
10 off in, after she threatened Officer Bacchus. (Id.)  On February 5,
11 2019, defendant called SA Chapman and, on a recorded call, once again
12 falsely denied that she was at the Long Beach SSA Office on December
13 12, 2018. (Id. at ¶ 19.)  Defendant claimed instead that she had let
14 one of her relatives borrow her car that day. (Id.)

15 **III. THE PRESENTENCE INVESTIGATION REPORT AND RECOMMENDATION**

16     The USPO calculated the total applicable offense level as 14 and
17 defendant's criminal history as category I. (Id. at ¶¶ 35, 45.)
18 This results in a Guidelines range of 15 to 21 months of
19 imprisonment.

20     Nevertheless, the USPO recommends one year of probation, a six-
21 level downward variance from a Zone D Guidelines range sentence,
22 which mandates a term of imprisonment.[1] (Dkt. 69 at 1–2.)  The USPO
23 also recommends a fine of $7,500 and a special assessment fee of
24 $100. (Id.)

25
26
27     [1] Where the applicable guidelines range is in Zone D of the
   Sentencing Table, the minimum term of imprisonment must be satisfied
28 by a sentence of imprisonment without the use of any imprisonment
   substitutes.  U.S.S.G. §§ 5C1.1(f).

1    **IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

2         The government recommends a sentence of six months' imprisonment

3    followed by a term of supervised release with a condition of six

4    months' home detention and a $15,000 fine.  This represents a

5    one-level downward variance and a low-end recommendation using an

6    offense level of 13.[2]  The government recommends that, during the

7    period of home detention, defendant be allowed to leave her residence

8    to continue her employment as a Nurse Consultant with the San Gabriel

9    Pomona Regional Center and to participate in mental health treatment

10   -- both as approved by the USPO.  In addition, the government

11   recommends the same conditions for supervised release as those

12   recommended by the USPO.[3]  (Dkt. 69 at 2.)

13        The government submits that the sentence is sufficient, but not

14   greater than necessary, to reflect the seriousness of the offense, to

15   promote respect for the law, to provide just punishment for the

16   offense, and to deter defendant and others from committing similar

17   crimes, while accounting for defendant's history and characteristics.

18   18 U.S.C. § 3553(a)(1), (a)(2).

19

20

21

22   ─────────────────

23        [2] A one-level downward variance results in a Zone C Guidelines
     range sentence.  For applicable sentence ranges in Zone C of the
24   Sentencing Table, the minimum term may be satisfied by either: (1) a
     sentence of imprisonment; or (2) a sentence of imprisonment that
25   includes a term of supervised release with a condition that
     substitutes community confinement or home detention, provided that at
26   least one-half of the minimum term is satisfied by imprisonment.
     U.S.S.G. § 5C1.1(d).

27        [3] With respect to the first condition recommended by the USPO,
     the government notes that the standard conditions of probation and
28   supervised release are now governed by General Order No. 20-04, which
     superseded General Order No. 18-10.
                                    5

### A.   18 U.S.C. § 3553(a)(1): Nature and Circumstances of the Offense, and History and Characteristics of Defendant

As to the nature and circumstances of the offense, several factors support a sentence of six months' imprisonment, followed by six months' home detention.  First, from the moment she arrived at the Long Beach SSA Office until she left, defendant showed a clear disregard for the security of patrons and employees of the SSA and those officers sworn to protect them.  Defendant's threat to kill Officer Bacchus was not simply a one-off comment, but rather the culmination of a series of escalating encounters with PSOs during which defendant openly displayed mounting hostility and aggression towards them, interfering with their ability to provide for the safety and security of the SSA Office.

Defendant's behavior was entirely unprovoked.  Defendant: (1) initially refused to wait in line; (2) became combative and yelled obscenities and racial slurs while in line not only at the PSOs, but also the other visitors in line, referring to them as "illegal Mexicans"; (3) blocked the entrance to the SSA for several minutes and threatened to get Officer Bacchus's "black ass" fired; and (4) finally threatened to shoot and kill Officer Bacchus using a gun in her car.  As a result of defendant's alarming behavior, all three PSOs at various points had to focus their attention exclusively on calming down and monitoring defendant, which detracted from their ability to protect the SSA Office, including its employees and other visitors, from other danger or harm.  The clearest example of this was when all three PSOs were forced to leave their duty stations and come out to the parking lot in direct response to defendant's threat, leaving the rest of the building unattended.

Second, defendant's crime was perpetrated against Officer Bacchus.  Threats to assault and murder such officers are extremely serious offenses, not just because of the psychological harm to the individual victim, but also because of the damage that such crimes have on the ability of security personnel to conduct their sworn duties safely.  At trial, all three PSOs testified to being in fear for their life when they heard defendant's threat.  They also continued to think about defendant's threat and remained on alert due to its serious nature for several days afterwards.  Defendant's threat impeded these officers' ability to efficiently and effectively serve the public.

Third, rather than admit wrongdoing or apologize when asked about the threat several days after it had taken place, defendant lied about it on two separate occasions to law enforcement by claiming she was never even at the SSA Office that day.  Defendant's conduct on the day of the crime and in the time since then clearly demonstrates a failure by defendant to accept responsibility or even express remorse for her crime.

That said, this is defendant's first encounter with the law.  Defendant does not have any prior criminal history.  (PSR ¶ 45.)  As noted in the PSR, defendant's commission of the crime also appears to have coincided with the onset of defendant's mental health issues and the subsequent loss of her job in May 2018, following an established and successful career as a nurse.  (Id. at ¶¶ 65, 74-77.)  Since August 2019, defendant has successfully maintained employment as a nurse.  Defendant also appears to be participating in mental health counseling since May 2018, although the frequency and the length of the treatment plan are unclear.

1    As such, the government's sentencing recommendation, which

2  represents a one-level downward variance, appropriately reflects the

3  serious nature and circumstances of the offense, and the history and

4  characteristics of defendant.

5    **B.    18 U.S.C. § 3553(a)(2): Seriousness of the Offense; Respect**
       **for the Law; Just Punishment; Adequate Deterrence; and Need**
6      **for Medical Care**

7    The government's recommendation also accurately reflects the

8  seriousness of the offense, promotes respect for the law, and

9  provides just punishment for the offense.

10   As described above, defendant's threat to assault and murder

11  Officer Bacchus was undeniably serious.  At trial, all three PSOs

12  testified that defendant's threat was one of the most serious threats

13  they had ever encountered as a PSO.  Defendant's threat was so

14  serious that defendant is now banned from visiting any SSA office in

15  person, without prior written approval from the SSA.  (PSR ¶ 13 n.1.)

16  The fact that defendant repeatedly lied about ever having been at the

17  SSA Office on the day of her threat is a clear example of defendant's

18  consciousness of guilt and suggests that even defendant took her

19  threat seriously.  (Id. at ¶¶ 18-19.)

20   The recommended sentence will also promote respect for the law,

21  provide just punishment, and deter others from making similar

22  threats.  A significant (but not greater than necessary) term of

23  imprisonment will underscore to defendant and others that threats to

24  shoot and kill persons assisting federal officers and employees will

25  result in serious consequences, regardless of whether the conduct

26  results in physical harm.

27   As part of her sentence, defendant will be allowed and required

28  to seek mental health treatment for the duration of her term of

8

supervised release.   Therefore, the government's recommended sentence balances the foregoing factors with defendant's need for continued mental health treatment.

**V.    CONCLUSION**

   For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) six months' imprisonment followed by a term of supervised release with a condition requiring six months' home detention, except defendant may leave her residence to maintain employment and participate in mental health treatment; (2) a $15,000 fine; and (3) a $100 special assessment.